UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA

                                                    11 CR. 712 (SJF)

   Against

MARIO CAMPOS

                Defendant.
_____

## SENTENCING MEMORANDUM ON BEHALF OF MARIO CAMPOS

                                    Donald D. duBoulay
                                    Attorney for Mario Campos
                                    305 Broadway, Suite 602
                                    New York, New York 10007
                                        (212) 966-3970

**Donald D. duBoulay**             305 Broadway, Suite 602
Attorney at Law                  New York, New York 10007

Telephone: (212) 966-3970
Fax        : (212)941-7108
E-mail     : dondubesq@aol.com

                                                   December 11, 2014

Honorable Sandra J. Feuerstein
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

Re: United States v. Mario Campos
       11 Cr. 712 (SJF)

Dear Judge Feuerstein:

       This memorandum is respectfully submitted in connection with the sentencing of Mario Campos scheduled for December 15, 2014. On November 26, 2012 Mr. Campos pleaded guilty before Magistrate Judge William D. Wall to one count charged in an indictment of participating in a conspiracy to commit wire fraud.

       Mr. Campos has accepted full responsibility for his involvement in this offense. He recognizes that participating in the charged offense was deeply wrong and inconsistent with his otherwise productive and law abiding life. He knows he has brought tremendous pain and hardship to his family. In light of the sentencing factors reflected in 18 U.S.C. 3553 (a), we urge this Court's consideration and leniency and respectfully ask the Court to impose a sentence that does not include incarceration and impose a sentence that requires a significant commitment to community betterment.

II.     **The Court's Discretion at Sentencing**

The United States sentencing Guidelines are no longer binding on the Court after *United States v. Booker*, 125 S.Ct. 738 (2005).  In light of *Booker*, the guidelines are now only "the starting point and an initial bookmark" at sentencing. *Kimbrough*, 128 S.Ct. at 574, *citing Gall v. United States,* 128 S.Ct 586,596 (2007).  The Court may not simply presume that the guideline is reasonable. *Gall*, at 597. While the guidelines are only advisory at sentencing, it is incumbent upon the Court to fairly appraise the rationale behind a particular guideline calculation to determine whether it reasonably assesses culpability of an offense in the typical case. *Kimbrough*, 128 S.Ct. at 574 ("it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve §3553(a)'s objectives"), *citing Rita v. United States*, 127 S.Ct. at 2464-65 (2007).

In considering the recommended offense level for fraud, even as a starting point at sentencing, some courts have expressed a concern that the guidelines do not provide an adequate measure of culpability even in the typical case. The potential for unfairness and an unduly excessive guideline sentence results from the "inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss as many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear "objective", tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors. *See generally* Kate Stith & Jose A. Cabranes, Fear of

3

Judging: Sentencing Guidelines in the Federal Courts 69 (1998). *United States v. Adelson*, 441 F.Supp.2d 506,509 (S.D.N.Y. 2006)

If sentencing courts give too much weight to loss-driven guideline calculations, defendants may suffer "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guidelines calculation can visit on human beings if not cabined with common sense." *United States v. Parris*, 573 F.Supp.2d 744, 751(E.D.N.Y. 2008), *quoting Adelson*, 441 F.Supp.2d at 512.

We urge the Court to consider that where, as here, the severity of the recommended guideline range is driven largely by the "loss" calculation, the Court should find that the recommended offense level is more severe than necessary, even in a typical case, to fulfill the objectives of sentencing. Further, whether or not this Court agrees that the offense level is an appropriate starting point for sentencing purposes, the Court should nonetheless consider the non-guideline sentencing factors. As *Kimbrough* instructs, after the Court considers the applicable guidelines calculation, it must make an individualized assessment of the case-specific factors to determine whether, "in a particular case, a within guideline sentence is 'greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 128 S.Ct. at 570, citing 18 U.S.C. § 3553 (a). The "greater than necessary" language of the federal sentencing statute incorporates the need for the sentence to "reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense." 18 U.S.C. § 3553(a). Indeed, as the Supreme Court suggested in *Gall,* a sentence of imprisonment may not promote respect

for the law if it appears unduly harsh in light of the real conduct and circumstances of the particular case. *Gall*, 128 S.Ct. at 599.

A sentencing judge has "very wide latitude" to decide the proper degree of punishment for an individual offender and a particular crime. See *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). When imposing sentence, the court is required to consider all of the factors set forth in 18 U.S.C. 3553(a),

To arrive at such sentence, the Court is directed to consider, to the extent relevant: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the kinds of sentences available; (3) the kinds of sentences and the sentence range established in the Sentencing Guidelines ; (4) any policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. 3553 (a) (1), (a) (3)-(7).

The Supreme Court has often stressed the advisory nature of the Sentencing Guidelines. ("the Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable."); *Spears v. United States*, 129 S.Ct. 840, 841(2009) (per curiam) (sentencing courts can vary from the Sentencing Guidelines even where the case "presents no special mitigating circumstances").

III. **Factors Meriting Leniency**

Mr. Campos has been candid about his actions in this offense from the very inception of this case, and by his actions thereafter. He voluntarily met with the government and provided documents as requested. He has exhibited an extraordinary acceptance of responsibility for his part in this offense. The remorse he has exhibited for allowing himself to be part of the fraudulent scheme alleged here is genuine, and the potentially devastating impact that his incarceration will have on his family weighs

5

heavily upon him.

Mr. Campos' conduct in the charged offense consisted primarily of being the seller's attorney in several real estate transactions. At the request of a co-defendant with whom he had an ongoing business relationship he improperly prepared escrow letters stating that he had received a down payment from a buyer when he had not; he further issued checks at the direction of a same co-defendant at the closing to entities other than the seller. He did this knowing that it was improper to do so. Mario Campos however did not recruit, pay or control straw buyers, nor did he participate in obtaining false and inflated appraisals or take part in any of the acts attendant thereto. Mr. Campos was not aware of the extensive nature of the scheme charged in this case, his entire involvement in this matter revolved around his functions as an attorney at the closings and his actions at the behest of a principal and steady client. The only benefit Mr. Campos received over the course of the conduct that brings him before the Court is the $11, 675.00 in attorney fees he received in total for the various closings. He did not receive any other monetary profit from the purchase and sale of the properties in question. He did not profit one iota from monies received as a result of the inflated prices of the homes or the loans obtained from the banks, as did the two creators of the scheme.

> U.S.S.G. §3B1.2 App.N. 3(A) states… 'a defendant who is accountable under § 1B1.3 for a loss under §2B1.1(Theft, Property destruction, and Fraud) *that greatly exceeds the defendant's personal gain from a fraud offense* and who had limited knowledge of the scope of the scheme is not precluded from consideration for an adjustment under this [§3B1.2, mitigating role] guideline…"

Similarly although a sophisticated means enhancement is applied here consistent with the Guidelines. Mr. Campos actions here are hardly intricate. U.S.S.G § 2B1.1App. N 9 (B)

6

states :

> "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense…Conduct such as hiding assets or transactions , or both , through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."

Mario Campos played a relatively small role in this fraudulent scheme. He was unaware of the scope of the fraud, he did not devise or otherwise, manipulate the events that caused the execution of the scheme such as conspiring to set the prices of the homes, recruiting straw buyers, or obtaining false appraisals for the houses.

Thus it is respectfully submitted that Mr. Campos limited involvement in this overarching scheme merits a variance from the advisory guideline range that would otherwise be applicable to all the co-conspirators regardless of their involvement in this matter.

**The History and Character of Mr. Campos**

Mario Campos emigrated to the United States from his native Costa Rica at the age of six.  With the exception of a very brief period, he has lived in New York all of his life. Reared in moderate economic circumstance by immigrant parents, striving to provide for Mario and his two siblings, the family enjoyed a relatively unremarkable childhood.  Mario's parents provided for their children by working full time at two jobs during his youth.  His father was a custodian of a building during the day and was employed at a factory in the evening. Mario's mother was similarly employed full time during the day and evening by working at two different factories. As a result Mario, a grammar school student had the responsibility of caring for his toddler sibling,

7

including changing her diaper and feeding her while his parents were at work in the evening.

Mario attended the local Catholic grammar school, then attended St. Johns University in Queens, New York and eventually graduated from Touro College Jacob D. Fuchsberg Law Center in June 2007. During his high school years Mario was employed as a custodian of a building that employed his father during the summer. Mario continued his employment as a custodian/doorman throughout his college years and even during his Law school years, working 20-28 hours a week during this period.

After being admitted to the Bar, Mario obtained employment at a series of small Law offices handling misdemeanor criminal cases and family court cases. He eventually was hired by the law firm of Ivan Guerrerro Esq, where he learned to close real estate purchases. It was while employed there that he met John Zizzo, a banker and Paul Argotte, a real estate broker.

In 2003 Mario opened his Law practice, which consisted of family and criminal court matters with a smattering of real estate cases. Eventually Paul Argotte began referring clients to him to handle the real estate closings, and Mario became associated more closely with John Zizzo, a reputable banker that many brokers used to finance their clients loans. The overwhelming number of transactions that Mario closed with Mr. Argotte and Mr. Zizzo were legitimate and above board. A significant part of Mario's practice consisted of the referrals from Mr. Argotte, and financed by Mr. Zizzo. Eventually Mario was asked to bend the rules, and he acquiesced in the request to write false escrow letters, and cutting checks to Lauro Gutierrez. He suspended his good

8

judgment for the sake of keeping his business ties ongoing. Mario was not a participant in the scheming going on before or after the closings in question.

Mario Campos is the father of three well-adjusted children, ages 15, 13 and 10. His two oldest attend St. Johns H.S., a private Catholic school, and his daughter attends Grammar school. Mr. Campos has been happily married for eighteen years. His wife's medical condition has been reported in the Presentence report.

At the age of 20, Mr. Campos was diagnosed with an irregular heartbeat. He was later diagnosed with sleep apnea, a potentially serious sleep disorder in which breathing repeatedly stops and starts. More recently, Mario has been diagnosed with Brugada Syndrome, an indicator of an irregular heartbeat. For more than a year now Mario has been under the care of physicians attempting to stabilize his heart palpitations.

In August 2014 Mario underwent a Pulmonary Vein Ablation procedure, to treat the atrial fibrillation. In this procedure catheters are inserted into the blood vessels of the leg up into the atrium (see attached lttr). Energy is then delivered through the tip of the catheter to the tissue that is the target of the ablation. Small scars eventually form and if successful prevent the abnormal signals that cause the atrial fibrillation from impacting the heart. It generally takes at least 6 months to determine if the procedure was successful. In November 2014, less than a month ago a loop recorder (ECG) was implanted subcutaneously to better monitor his heart condition (see attached letter) and to provide better information as to when and why his heart suddenly palpitates. He continues to see his doctors on a monthly basis to monitor his condition.

**The Instant Offense**

The mortgage fraud scheme that is the heart of the offense in question primarily revolved around Lauro Gutierrez a construction contractor and Paul Argotte, a real estate broker, and John Zizzo a banker, who together devised a scheme to solicit straw buyers, inflate their resources, and with that information obtain an inflated bank loan to buy property. The profit which consisted of the difference between the actual cost of the property and bank loan were then shared by Messrs.'Argotte, Gutierrez and we believe John Zizzo. Mario Campos did not share in any of the illicit profits from the transaction. He was hired merely as one of the attorneys to close the sale.

**Sentencing factors under 18 U.S.C. § 3553**

*Sufficient But not greater than necessary*

As noted earlier, 18 U.S.C. 3553 (a) expressly provided for a sentence 'not greater than necessary" to achieve the purposes of sentencing . *United States v. Johnson*, 964 2d 124, 125 (2d Cir. 1992) ("the United states Sentencing Guidelines do not require a judge to leave compassion and common sense at the door of the courtroom") . The life altering consequences of Mario's ill-fated decision to accommodate his benefactors, including loss of prestige, profession and pride as well as relentless self-torment should play a role sentencing.  These consequences can serve as a deterrent at least as effective as a period of incarceration. This court is respectfully reminded that 18 U.S.C. §3582(a) provides that "imprisonment is not an appropriate means of promoting correction and rehabilitation".

Mario Campos played a relatively minor role in this fraudulent scheme. He was totally unaware of the scope of the fraud, and did not devise or otherwise manipulate the events that caused the execution of the scheme.

In view of Mr. Campos's limited involvement in this scheme, more importantly his limited financial gain, it is respectfully submitted that pursuant to 18 U.S.C. 3664 (h) the Court apportion liability for the payment of the restitution to reflect the level of contribution to the victim's loss, and the economic circumstance of Mr. Campos. Mario, played a significantly less important role in the perpetration of the scheme, and has an ongoing obligation of supporting a family with three young children. Fairness dictates that those who reaped the rewards of this scheme should have to pay the bulk of the restitution in this matter.

> 3664 (h) states:
> If the court finds that more than 1 defendant has contributed to the loss of the victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

**Conclusion**

In the final analysis, after considering the sentencing guidelines and the 3553 (a) factors, the Court is tasked with imposing a just sentence on the defendant. In the end, I recognize and respect that to whatever extent the evolution of the law permit's a court's discretion to fashion an appropriate sentence, such a decision is not an easy one for the court. I ask that the court consider that my client is an unlikely recidivist, that he is a young man whose moral compass failed him for a brief period in 2008. His actions in

11

this case, was aberrant, and not an indicator of how he practiced law or how or how he lived his life. His acquiescence to the requests of business associates was misguided and wrong. He fully acknowledges that. He has otherwise led a respectable and honorable life. His engagement in this crime is truly an aberrant foray into criminality.

The collateral consequences of the conviction in this case are of course great. Mr. Campos, has lost his license, his profession, the respect of the bench and bar and his community. That in itself is an enormous weight to shoulder.

In light of the factors enumerated in 18 USC 3553 (a), and in consideration of Mr. Campos serious physical ailments, it is respectfully requested that the Court impose a sentence of probation. This sentence, it is respectfully submitted, would fulfill the Court's obligation to impose a sentence that is sufficient, but not greater than necessary to satisfy the goals of federal sentencing.

                                    Respectfully submitted,

                                    ___/s/_____
                                    Donald D. duBoulay

cc: Christopher Ott, AUSA (via ECF)
    Mario Campos